The Honorable, the Judges of the United States Court of Appeals for the Eighth Circuit. Hear ye, hear ye, hear ye, the United States Court of Appeals for the Eighth Circuit is now in session. All persons having business before this Honorable Court may now draw near and they will be heard. God save the United States and this Honorable Court. Please be seated. Madam Clerk, would you call our docket for this morning, please? Yes, Your Honor. The following cases are scheduled for argument this morning, Thursday, September 18, 2025. Case number 24-2579 from the Eastern District of Missouri, Juan Mitchell v. Saint Louis County, Missouri. Case number 24-3238 from the Southern District of Iowa, Kent Payne et al. v. Ira Lee Ball Community Mental Health Services et al. Case number 3 for the day, case number 24-2057 from the Eastern District of Arkansas, United States v. Jonathan Wright. Last case, case number 24-2930 from the Southern District of Iowa, United States v. Timothy Kavanaugh. Case proceeding is Juan Mitchell v. Saint Louis County, Missouri et al. Mr. Pedroli, if you're prepared, please proceed. Good morning, Your Honors, Counsel. May it please the Court, it's a pleasure to be back in front of you, Judge Smith, and it's a pleasure to argue in front of Judge Grunder and Judge Shepard as well. We're here on the case of Juan Mitchell v. Saint Louis County et al. We're seeking remand of all claims related to the deliberate indifference of the nurses, the failure to train, supervise, and discipline, and the other Monell claim of unconstitutional policy and or custom. And I make that distinction at the get-go because we're going to argue about that later. We have pled alternatively for count 3 an unconstitutional policy, so an official policy that is unwritten. And in the alternative of that, we've also alleged an unconstitutional custom, and we believe based on precedent, including recent precedent in the SORCON case, Slip Opinion 24-1333, which was recently decided, a Monell claim can argue that there's an unconstitutional policy in which you do not need to allege a pattern in practice. Just notice. So to begin with, let's start with the legal standard. This is a 12b6 dismissal. A claim is plausible, obviously, on a space when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Plausibility standard is not a probability standard. So let's begin there. It's more than a sheer possibility, thus a complaint, according to Twombly, a complaint may proceed, quote, if it strikes a savvy judge that actual proof of the facts alleged is improbable and that recovery is very remote and unlikely. So according to Twombly, even if the district court believes that recovery is very remote and unlikely, which I believe the district court believed in this case, you still may let the case go forward. There's been no discovery in this case. There have been allegations related to someone who died, a pretrial detainee who died in the St. Louis County Jail. Sufficient factual allegations were pled about the treatment of that, and we're going to get into that next. But the way I see it is there's ways to view a complaint. It's either guaranteed, it's impossible, and in the middle there's a probability, which I would say is 51% more likely than not. We don't need to get there at the 12b6 stage. We only need to get past that it's a sheer possibility. So I would say somewhere between 5 and 51%. I think the purpose of Twombly and Iqbal is to weed out the maybe 3, 5, 7% of cases that are absurd, that don't make claims. This one does. Let's talk about the serious medical need because this is a case about serious medical need and deliberate indifference to it. The serious medical need here was obvious. We're going to hear that the symptoms were just like a flu and it was easy to miss and all of that. That's not true. The serious medical need here was pain in the head, worst headache of life, slurred speech, unsteady gait, inability to walk, couldn't talk at times, was staggering. We have video. The video alone that we described in the lawsuit, three clips of video, show this otherwise healthy 31-year-old inmate who was fine the entire time he was there up until a few days before Christmas. Suddenly, he's staggering. He doesn't know which way he's going. He clearly has neurological damage. He's having a stroke and he was having it for days and everyone saw these serious medical needs and did nothing. So your claim against all the defendants you think is equally strong or is there someone among the defendants that you consider more responsible for? That's a good question. The answer is yes, we do believe some are more responsible than others. But because we haven't done discovery, we don't know what they're going to say. For example, we have a remote doctor, Dr. Parker. He's not even in the building. I don't know what they're going to say about these conversations. He wrote a medical record after Mitchell died saying, well, I told the nurses this. We don't know. The nurses may deny that he told them that. So we don't know really what happened here. We do know that there are claims in the medical records. Records, frankly, that I don't trust. As we've learned in the past, some of these records you can't count on. Some of them were written later. Some of them are, you know, CYA type letters where they're protecting their own interests and pointing the fingers at others. Nurse Heitman, however, was called up there on an emergency call at four in the morning. She argued with the roommate. He couldn't talk. He was telling his roommate to turn out the lights or he was screaming about lights and there was no lights on. Clearly, he was having neurological issues. He couldn't walk. He was staggering. And according to other testimony, he had an unsteady gait and he was unable to walk. Nurse Heitman, two hours later, they pressed the emergency call button again. It now six in the morning, four and six. This is a guy that's seriously struggling. She didn't respond. She blew it off entirely. She did not go look at him and she said, tell him to go see the next nurse. So for that reason, we do think that Heitman has, from the record we know now, which is prediscovery, we think that she has a lot more culpability than others. But every single nurse that we've sued in this case, and we haven't sued them all. We didn't sue Shatia Reese. We didn't sue others. So we were selective. We sued the ones who knew of all of these symptoms that I just described, the staggering, the difficulty walking, the worst headache of the life, nausea, vomiting, begging to go to the hospital at four in the morning. He's begging to go to the hospital, Heitman. Heitman was the first nurse to see him that we sued. All the nurses subsequent to Heitman were people that were aware, obviously, of the same symptoms Heitman was. Reynolds saw him the next day. She was the next nurse. We have another video showing him come out. He's now being carried by other inmates. He's being carried by other detainees. So you can see this on the video. She sees it. She doesn't write it down. And we've alleged here that there's an under-reporting problem in the St. Louis County Jail, and it's a custom and a practice to under-report. Because when you report accurately, you have to work harder. Then you have to call the doctor. Then you have to do these things. What fault did the court find with your pleadings? Well, I think generally the court found that there was some care. The court said, well, there was some care. He was seen four times. What do you expect? Four nurses saw him. That's care. And I believe that the court, and this was an error, because we have a lot of cases in the Eighth Circuit on that, especially a case that just came out, it was Dantzler. And I think we filed a Rule 28 J letter about this. Dantzler v. Baldwin, Slip of Penny 233382, a circuit that was in April 8th of 2025, reiterated that some medical care defense does not immunize or foreclose deliberate indifference. So we believe at this stage that the district court said, well, there was medical care. He was seeing nurses. What more do you expect? Well, a lot more when someone presents with these symptoms. If someone's staggering, has stroke symptoms, and has all the symptoms that we've discussed, there needs to be more care, because the problem is, is some nurses just checked the box. I saw him. I'm going to check that box. I did my job. I don't have to do anything else. Check-the-box nursing care in the Eighth Circuit is insufficient. And some medical care is an insufficient defense. So according to Dantzler, one, grossly incompetent care, two, inadequate care, three, choosing an easier or less efficacious treatment, four, delaying care, and five, denying care and access to medical care can all constitute deliberate indifference. We've made all these allegations. Now, we should be allowed to get discovery to find out a little bit more about this and then have this fight at summary judgment where it's proper to have it. But what did you need to plead in terms of what the defendants knew about the condition that the victim was in? Great question. Because actual knowledge, you have to plead that, and we did. We pleaded for every single defendant. Actual knowledge of what? That it was a stroke, or actual knowledge of the symptoms? Right. They don't need to know it's a stroke. They just need to know he has a serious medical need. And this reminds me of the case that I was in front of you in January on the Tishanda Troop case where the 20-year-old had leukemia. Well, an LPN's not going to know he had leukemia. He's just going to know those symptoms are so serious that something needs to be done. Same case here. You don't need to know someone's having a stroke. If they come to you and they're slurring their words, and all the other detainees are saying, my God, this guy needs a hospital. He was a 31-year-old, average guy, walking around and doing work, and then all of a sudden he's staggering, slurring his words, and he can't speak. We're required to look defendant by defendant and what's pled with respect to each defendant. And it seemed to me that with respect to Heitman, Reynolds, and Howard, you pled a pretty vast array of symptoms, but not so much with all the others. Some of them just observed a headache, which may not be as serious as slurring words or inability to walk. What about those defendants? And so which defendants are you? In my mind, everyone other than the three I mentioned. So we are appealing Parker. Parker is the physician's assistant. Now he was told, he said, I discussed sending Mitchell to a hospital if his difficulty with ambulating or walking continued. Now he wrote this after he died, but he's claiming he told the nurses that if his difficulty walking continues, we're going to have to send him to the hospital. So he had actual knowledge that there was a guy who was having difficulty walking, 31 years old, staggering, and all that. So we believe he had actual knowledge. We also believe, well, we also allege, we don't just believe, we allege that Heitman knew because we allege specifically Heitman saw that he could not walk. Heitman was one of my... We allege Reynolds specifically knew because Reynolds in her medical record also said he had an unsteady gait. Now the real problem with Reynolds, which I think makes her incredibly culpable, is she was the first nurse to see him at 7 a.m. on Christmas morning. And on that morning, she said, oh, I think he might be malingering. Now she saw other symptoms that indicated that malingering, extremely dry mouth and all these other observable symptoms. We believe that her saying, oh, he might be malingering, again, is the easy way out. It's checking the box. You don't have to call anybody. You don't have to do anything. He goes back to his cell. 7 a.m. she sees him. He's having a stroke and he gets delayed until 1 p.m. And he doesn't even get to the infirmary. Now he should have been sent to the hospital. The infirmary is not where you want to go. I was talking more specifically about Coe, Parker, Bonanno, Doucette, whether there's and then those 1 through 4, whether there was sufficient pleading of knowledge of the more serious symptoms, the more unusual, the non-flu-like symptoms. And I understand that. I think we adequately pleaded that all of the does had knowledge of the more serious symptoms, the unsteady gait, the inability to talk and the slurring. We have four or five different laypersons who reported this to not only correctional officer does but also about the nurses. All of the nurses saw it though. Reynolds is extremely culpable and then the last nurse to see him is Howard. So she's the final person to see him before he dies, closes the door, walks away, three hours later he's dead and he's having a stroke. So we think that all those nurses are culpable. I'm going to reserve my time. I'm going to address Doucette because I think the Monel claims are directly tied to the Shana Troop case, which we had remanded and reversed and sent back, and they're related to the identical claims of failure to follow the standing orders and Doucette's knowledge. And we have her testimony. We pleaded in this case because these are sort of twin cases. These are two people that died within the same year. Mitchell was the last death. The catchings who died of leukemia was in March. Mitchell was in December. Same defendant doctors, same defendant standing orders, and the same failure, admittedly, to even find out whether or not the nurses that were under collaborative practice agreements were actually enforcing and following her standing orders. And we believe she had knowledge that they did not. I'll reserve the rest. Thank you, Mr. Padrula. You can choose which order you want to go. My list starts with Mr. Cody, so we can go that way. Thank you, Your Honor. Morning, Your Honors. May it please the court. I am representing the nurse defendants in this case, Heitman, Reynolds, Howard, and Parker. And a couple of things that I think we need to be emphasized in this case is that because we are dealing with a claim of deliberate indifference, as opposed to a claim for negligence, and the plaintiff has a separate lawsuit going on right now for negligence against all of these same defendants. But because what we're dealing with here is a claim for deliberate indifference, the subjectivity is of extreme importance. It is imperative on the plaintiff to allege facts indicating that the defendants were subjectively aware of a substantial risk of harm, and that they subjectively knew that their conduct was inappropriate in light of that harm that they were aware of. There does not seem to be any suggestion that any of these defendants were aware that Mr. Mitchell was suffering from a stroke. Did they have to know he was having a stroke? No, Your Honor, but the analysis changes depending on what conditions they were aware of. As the district court pointed out, if you are aware someone is having a stroke and you provide them with water and Tylenol, that would not be appropriate care. But given the symptoms, the nonspecific symptoms that these nurses are alleged to have been aware of, that is what the analysis of their conduct depends upon. The part that concerns me that is beyond, in my mind, beyond flu is the slurred speech and the inability to walk. Those seem to be, in combination with the other more flu-like symptoms, seem to be sort of indicative of something more serious, like a stroke. Yes, and I think if the argument is going to be that these nurses should have been aware that he was suffering from a stroke, that is more of a negligence analysis. I am not suggesting that all of these nurses subjectively believed he was necessarily suffering from a flu, specifically, but the question is whether the conduct was inappropriate in light of the symptoms that they observed. Not just inappropriate conduct, but it has to be so bad that it rises to a level that is equal to criminal recklessness. And what we have here is all of these nurses, Heitman, Reynolds, Howard, and Parker, are all alleged to have provided him with some kind of treatment of at least some of the symptoms that they were aware of. Not much though. Water, Tylenol, and what, checking his blood pressure, I think, were the three things that I saw. As to Nurse Heitman, yes, the allegation is that she provided him Tylenol when he came and complained that he was vomiting and had a really bad headache. I would assert that that is treatment of a bad symptom that he was presenting to her and does not rise to a level of criminal negligence. The other defendants, for example, Nurse Reynolds, contacted the medical provider not once but twice, and then had him sent to the infirmary. Nurse Reynolds, the infirmary nurse, assessed his condition, gave him a urinalysis, contacted the medical provider, got orders from the medical provider, and then conducted the tests that were ordered by the medical provider. And Nurse Practitioner Parker would be the medical provider that I'm referring to. When he received word of the condition, gave orders for his treatment, eventually had him sent to the infirmary, gave orders once he was in the infirmary. All of that is a treatment of, I think, a substantial amount of treatment of the symptoms that were being observed. There seemed to be symptoms of dehydration and directions were given to start an IV if he couldn't drink. Was the IV ever started? There's not an allegation that the IV was started, but the order that is alleged is to start an IV if he could not drink water, and he's alleged to have been given water. So I think that the allegations indicate that Nurse Howard in the infirmary complied with all of the orders that she was given. And so if there are no more questions, that is my time. Thank you, Your Honors. Thank you, Mr. Cody. Ms. Chain? May it please the Court. My name is Victoria Chain, and I represent appellee Dr. Emily Doucette, who at the time of the events relevant to this matter was the acting co-director of the St. Louis County Department of Public Health. Now, as a preliminary matter, there can be no finding, or no pleading, rather, of supervisory liability against Dr. Doucette unless there is a finding and a pleading of an underlying violation of constitutional rights. What I'd like to address, first and foremost, is that co-defendants counsel, Mr. Cody— How do you get around the Troop case, then? Well, Your Honor, I did not have the benefit of hearing appellants counsel's full argument with respect to Dr. Doucette on that. I understand some of that's being reserved for the remainder of his time, but I do have the benefit of the Rule 28J letter he filed just a couple days ago. And basically, he says the Troop directly applies to Dr. Doucette and the other defendant appellees. Here's why I disagree. I think that case can be distinguished relative to Dr. Doucette, at least, in this matter. That's because at the time— Wasn't Dr. Doucette the party in the Troop case? Yes, that is correct, Judge Grunder. However, what's critical to that Troop decision was the decision in Ahearn. That was a 2020 decision by this Court where basically the Court said that at the pleading stage whenever discovery has not been undertaken, there's no special order that a plaintiff needs to obtain to be able to obtain information required to obviate claims against the defendants. And as such, information and belief allegations are then permissible in that limited circumstance. That was what it came down to with respect to Dr. Doucette and Troop. And here's why this is different. By the time this Third Amendment complaint was filed in this Mitchell matter, discovery was undertaken in the Troop case. You correctly point out that Dr. Doucette was also involved in that case. And the facts are quite similar in some ways as they pertain to Dr. Doucette. In particular, she was in the same role presiding over the County Department of Public Health. So what's very important in this matter is that Appellant even admitted he had the opportunity to depose her before this complaint was filed. He could have asked her conceivably anything. He could have asked her about her roles, about the policies and standing orders that were in effect in corrections medicine, how those policies and standing orders were enforced. And the critical point here is that he doesn't get the same benefit of the information and belief allegations in this matter because that deposition was had of Dr. Doucette like he did in Troop. That is a critical difference because the court's reverse and remanding with respect to Dr. Doucette in the Troop matter relied on an information and belief allegation regarding her supervision of Nurse Anthony Young, who remained a defendant in the case. He wasn't dismissed. And basically that allegation said on information and belief, Dr. Doucette supervises Nurse Young and she is responsible for, among other things, reviewing his charting and his interactions with detainees. You don't have, or excuse me, Appellant does not have that benefit here. So what that means is that Appellant has to overcome Dr. Doucette's official immunity, her qualified immunity. And to do that, he has to plead two things. First of all, that Dr. Doucette was actually aware, actually knew of a pattern of acts by her subordinates, that would be the particular subordinates that are named, the nurses and the PA in this matter, that those individuals were committing, they were engaged in behavior that was causing deprivations of constitutional rights or likely to do so. That's the first thing. Second thing, he also has to plead that Dr. Doucette, knowing that, was either deliberately indifferent to or tacitly authorized that conduct. He cannot do that here. Allow me to illustrate with an example. In the third amended complaint here, which bear in mind was taken after Dr. Doucette was deposed, we have a blanket allegation. She didn't do anything. She didn't supervise. She didn't train. Okay, well then in paragraph 177 on page 27, the practical nurse who did not follow standing orders days before Mr. Ketching's death, that was of course the inmate in the troop matter, was disciplined for ignoring standing orders. Paragraph 178, defendant Doucette knew this practical nurse ignored standing orders and met with him personally to discuss his discipline. He can't even plead the second element that I just laid out. He says in this claim that's supposed to be about Dr. Doucette having done nothing when she knew that all these bad things were going on in the jail, he then gives an example of her taking action personally when she learns that something occurred. I see that I'm out of time, so I thank you for your consideration and your time this morning. Thank you, Ms. Chen. Ms. Tourette. Good morning, your honors. Thank you for your time. Thank you to co-counsel. Who, what, where, when, why, and how. These are the factual allegations, the context that your honor referred to in the troop case that a plaintiff must plead to state a claim for 1983 liability against a local government. That analysis, of course, has two parts. The first part is that must state an unconstitutional claim against a governmental employee for deliberate indifference. The second is that plaintiff must allege an official policy, an unofficial custom, or by virtue of being an unofficial policy, a failure to train their employees. Is the Supreme Court held in Canton and then reaffirmed in Connick, plaintiff must allege that there's a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate the deliberate indifference from the purposes of failure to train, which is, again, from the Supreme Court in Connick. Here, the allegations are that Mr. Mitchell suffered his constitutional violation at the hands of St. Louis County because St. Louis County had either a lack of adequate training or a failure to, pardon me, an unofficial custom. I heard Mr. Pedroli mention that he may be referring to an unwritten policy, which I don't see in his appellate brief, but, of course, we'll hear that when it comes. With regard to count two, for a failure to train adequately, the plaintiff must allege that it was a failure to train and that the county was so deliberately indifferent to the obvious or no need to train that its failure to do so was a conscious disregard for anyone who came into contact with those employees. Plaintiff does not allege that here with regard to his failure to train count. He has ... His most described failure is that the county employees failed to send patients out or failed to treat serious medical injuries. Did part of it have to do with not complying with standing orders that were being given? Yes, your honor. Part of that is as well true. With regard to the standing orders, plaintiff alleges that the employees did not respond to an order from Dr. Doucette that anyone complaining of a severe headache had to ... They had to call the doctor. Plaintiff also alleges that Nurse Heitman failed to comply with physician's assistant Parker's requirement to update him on the symptoms. However, to have a failure to train under the 8th Circuit's jurisprudence and the Supreme Court's jurisprudence, the plaintiff has to allege that they knew there was a constitutional violation and that there was a pattern of constitutional violations that the municipality or local government was aware of. In this case, they haven't alleged that there was a pattern of failure in this regard and they haven't articulated what counties should have been doing for training. I want to back up just for one minute and clarify a point. Mr. Pedrilli repeatedly stated that we need to do discovery in this case. I'm happy to clarify this for record with a letter to the record. The parties engaged in discovery. There was a Rule 26 conference in this case. Plaintiffs served two sets of interrogatories on St. Louis County and two or three requests for production. St. Louis County produced at least 1,000 documents as well as all of the things that would name the John Doe's, to whom Mr. Pedrilli replies, and of course, all of that was before the district court entered its order. Well, was it? I thought this was a 12B6 rather than a summary judgment. It is a 12B6, Your Honor. If the district court considered the discovery, then it wouldn't be a 12B6, I don't think. You are correct, Your Honor. I apologize. I misspoke. The district court did not consider the facts. The parties were undergoing discovery as the court was ruling on the motion to dismiss. I just wanted to clarify that for the record. One other problem with regard to both the failure to train and the custom, plaintiff does not allege the context for which this court, the district court, can understand the medical issues in this case. I see I'm coming close out of time. I would just say the district court held that 1983 is not a font of tort jurisprudence to replace the actual jurisprudence provided by state law, which is also undergoing in this case right now. State law cases for negligence. With that, Your Honor, we ask that you affirm the district court judgment. Thank you, Ms. Durand. Thank you, sir. Mr. Pedroli, your rebuttal. Thank you, Your Honors. I would quickly like to refer to, again, the Sokrin case. That was Judge Grinder's opinion, and it was joined by Judge Smith. Very important case. Very important interpretation of Poundbauer, the Supreme Court case. We have alleged in our count three that there was an official policy or an unconstitutional custom. We pleaded in the alternative. We should be allowed to prove it. Sokrin also alleged the district court had an unwritten policy, I'm reading from it, of retaliating against individuals for their protected speech, and then citing Poundbauer stating that an official policy need not be committed to writing, and therefore, the plaintiff did not need to identify a persistent pattern of unconstitutional misconduct so long as she identifies that a constitutional violation resulted from an authorized decision maker making a deliberate choice of a guiding principle of procedure. In this case, we're alleging the same things. We did allege on paragraph 13 that Dr. Doucette is a final policymaker. She's a final policymaker. She signed the standing order. She executed it. It's hers as a doctor. She is responsible to ensure it's supervised. We provided her testimony, just like we did in the Troop case, saying I didn't supervise, and I didn't know if supervision was being done. I assumed they were doing it, but I never checked. That's enough to have it sent back, just like the Troop case, and I hope that answers your question about our allegations against Doucette. Running out of time. If there are any questions, I'd be happy to respond. I see none. Okay. Thank you, Your Honor. Thank you, Mr. Padula. The court wishes to thank all counsel for your participation before the court this morning in argument. It's been helpful. We'll continue to study the matter and render a decision in due course. Thank you. Counsel may be excused. Madam Clerk, let's call case number two.